2000 OK CR 13

**STATE of Oklahoma, Appellant,**

v.

**Garrell Roger McNEAL, Appellee.**

**No. SR–1999–1091.**

Court of Criminal Appeals of Oklahoma.

July 17, 2000.

---

**13.** *LCR, Inc., supra* note 9 at 1391.

## ACCELERATED DOCKET ORDER

¶1 On February 16, 1999, Appellee, McNeal, was stopped at a drug checkpoint after he exited at 121 st Street off of Highway 75 in Tulsa, Oklahoma. Marijuana was discovered in McNeal's car after he consented to a search of the vehicle, and admitted having marijuana in his possession. McNeal was ticketed for Unlawful Possession of Marijuana and released. On April 12, 1999, McNeal filed a motion to quash alleging the stop, search, seizure and arrest all violated the Fourth Amendment. The motion was granted, and the evidence suppressed. From this ruling, the State appeals.

¶2 On appeal Appellant, the State of Oklahoma, raised one proposition of error:

1. The stop of a vehicle at a temporary roadblock or checkpoint was not an unreasonable seizure when balanced against the State's interest in interdicting the drug flow through Oklahoma on its highways, when the checkpoint effectively advances the State's interest and the interference to the public is slight.

¶3 Pursuant to Rule 11.2(A)(5), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (1999) this appeal was automatically assigned to the Accelerated Docket of this Court. The propositions or issues were presented to this Court in oral argument April 13, 2000, pursuant to Rule 11.2(F).

¶4 The State of Oklahoma, set up a drug checkpoint on Highway 75 and 121 st St. in Tulsa, Oklahoma. The State noted in its application filed with this Court that this was a "drug checkpoint" the sole purpose of which was to "interdict drug couriers on Highway 75 which is a major North/South highway used to transport drugs through Oklahoma."

¶5 Testimony at the hearing on McNeal's motion revealed the following information about the logistics of the checkpoint. The State placed signs on the highway alerting drivers that there was a drug checkpoint ahead. The sign was placed ⅛ of a mile prior to the exit ramp for 121 st St. on Highway 75. The sign stated the checkpoint was ⅛ of a mile ahead and that drug dogs would be in use. The sign did not say that the checkpoint was on Highway 75, however, the State anticipated that drivers would make that assumption. The signs were in both Spanish and English. The checkpoint was not on Highway 75, but was on the exit ramp at 121 st Street. The checkpoint was placed so that it could not be seen until after drivers actually exited the highway. Officers stopped every vehicle that took the exit, completed a driver's license check and then asked the driver why the exit was taken. The checkpoint was conducted between the hours of 9 a.m. and 3 p.m. Uncontroverted testimony at the hearing also revealed the following pertinent information: (1) there was a written plan for the checkpoint; (2) the plan procedures were followed; (3) every vehicle was treated the same; (4) officers at the checkpoint were easily identifiable as law enforcement; (5) the signs off the exit ramp clearly indicated that there was a checkpoint on the ramp once the vehicle exited; (6) the traffic was stopped at the bottom of the exit where drivers were required to stop at an existing stop sign; (7) vehicle delay/detention was slight, only long enough to verify license, registration and ask why the individual took the exit; (8) no stop, other than where drugs were suspected, took longer than 2 minutes; (9) suspect vehicles were diverted to facilitate the flow of traffic; (10) the checkpoint was at a remote location, such that only local traffic would have a reason for using the exit; (11) drug dogs were present to sniff the vehicles where the officers felt there was "reasonable suspicion"; and (12) those who did not wish to talk to the police were allowed to proceed without talking to the police. It was estimated that between 500 and 1000 vehicles came through the checkpoint that day. Of those, 13 were stopped: 3 had no valid license; 10 were detained for "drug interdiction"; and drugs were recovered from 5 of the 10 vehicles. There was no delineation of the quantity or type of drugs recovered from the vehicles on this particular day at this particular checkpoint.

¶6 Don Bell, an investigator for the Tulsa County District Attorney's office, testified that there have been "numerous" drug busts at the State's various drug checkpoints.

With respect to effectiveness of the checkpoint in interrupting the flow of drugs, Bell testified that the State has arrested probably "75 to 80 people out there" and "seized a large amount of drugs in all of them [drug checkpoints] that we've had." There was also testimony that drivers with small amounts of drugs, like McNeal, are not arrested, but are ticketed and sent on their way. It is apparent that the State's goal is to interrupt the flow of large quantities of drugs being transported through the State of Oklahoma.

¶ 7 The sequence of events in this case was as follows. Appellee McNeal exited the highway at the checkpoint location. Investigator Gabriele Smith of the Tulsa County District Attorney's office approached McNeal's vehicle and asked why he had taken the exit. McNeal stated that he was driving around and didn't know why he had taken the exit. Investigator Bell then approached the car and told McNeal that officers were conducting a drug enforcement checkpoint. Bell asked if McNeal would give him permission to search the vehicle, and to which McNeal responded "[Y]es, you can, but there's marijuana in my car." McNeal then retrieved the marijuana from his console, along with a brass marijuana pipe, and gave them to Bell. McNeal was given a citation for Unlawful Possession of Marijuana, a misdemeanor, and released.

¶ 8 This case is not about unreasonable treatment of persons stopped at a checkpoint, nor is it about the unreasonable operation of the checkpoint itself in terms of hours of operation, the established checkpoint program or the manner in which any particular driver was stopped. Rather, the challenge here is the use of drug checkpoints generally. McNeal argues simply that the State cannot set up a roadblock/checkpoint solely to search for drugs. In granting McNeal's motion to suppress, the District Court of Tulsa County, the Honorable Kyle Haskins, Special Judge, ruled that there was no clear authority under Oklahoma law to justify temporary roadblocks for purposes of conducting drug checkpoints, especially utilizing deception for purposes of conducting custodial detentions and seizures without probable cause. With-out clear legislative or judicial guidance, Judge Haskins was unwilling to sanction the State's drug enforcement checkpoints.

¶ 9 A question of first impression for this Court is whether a drug interdiction road-block/checkpoint, set up solely to randomly search motor vehicles for the presence of drugs in an effort to deter trafficking in illegal narcotics, violates the individual's right to be free from unreasonable searches and seizures as contemplated by the Fourth Amendment to the United States Constitution and art. 2, § 30, of the Oklahoma Constitution. We are unwilling to say at this juncture that State law enforcement can never conduct a drug interdiction checkpoint. However, on the facts of this case, we do not find that the District Court erred in granting Appellee's motion to quash.

¶ 10 We have previously held that article II, section 30 of the Oklahoma Constitution and the Fourth Amendment of the U.S. Constitution contain almost exactly the same wording, and in substance are identical. Years ago this Court recognized the close relation of the Oklahoma Constitution's Article II, § 30 and the Fourth Amendment to the United States Constitution when we stated "[t]his provision of our Constitution [Art. II, Section 30] is almost an exact copy of the fourth amendment of the Constitution of the United States...." *Long v. State*, 1985 OK CR 119, ¶ 6, 706 P.2d 915, 917 (quoting *De-Graff v. State*, 2 Okl.Cr. 519, 103 P. 538 (1909)).

¶ 11 We turn to the provisions of our Constitution and to the provisions of the United States Constitution, as interpreted by the Supreme Court of the United States, for guidance. There is no dispute here that McNeal was subjected to a seizure when his vehicle was stopped at the checkpoint. *See Michigan v. Sitz*, 496 U.S. 444, 450, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990) "[A] Fourth Amendment 'seizure' occurs when a vehicle is stopped at a checkpoint." *See also, State v. 1983 Toyota Corolla*, 1994 OK CIV APP 51, 879 P.2d 830, 834, quoting *United States v. Guzman*, 864 F.2d 1512, 1519 (10th Cir.1988) ("the stopping of a vehicle and the detention of its occupants constitute a 'seizure' within the meaning of the Fourth Amendment");

*Edmond v. Goldsmith,* 183 F.3d 659 (7th Cir.1999) citing *Whren v. United States,* 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) "Stopping a car at a roadblock is a seizure within the meaning of the Fourth Amendment".[1]

■ ¶ 12 Having established that the stop is a seizure as that term is contemplated by the Fourth Amendment, the question becomes whether or not the seizure is reasonable and therefore permissible. Searches and seizures must be conducted pursuant to a warrant based on probable cause. Fourth Amendment to the United States Constitution, art. 2, § 30, Oklahoma Constitution. However, in the event obtaining a warrant is not practical, search and seizure may be proper in cases where there exists probable cause or reasonable suspicion. *Chambers v. Maroney,* 399 U.S. 42, 51, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Abraham v. State,* 1998 OK CR 29, ¶ 4, 962 P.2d 647; *Scott v. State,* 1996 OK CR 57, ¶ 8, 927 P.2d 1066; *Coulter v. State,* 1989 OK CR 42, ¶ 5, 777 P.2d 1373, 1374; *Peters v. State,* 1986 OK CR 138, ¶ 8, 725 P.2d 1276, 1277.

■ ¶ 13 Limited exceptions have been created to the requirement that seizures be based on probable cause or pursuant to a validly issued search warrant. In *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the United States Supreme Court conducted a balancing test to determine whether or not a particular seizure violated the Fourth Amendment. The Court's concern was assuring that an individual's reasonable expectation of privacy was not subject to "arbitrary invasions" solely at the unfettered discretion of law enforcement officers. *Brown,* 443 U.S. at 51, 99 S.Ct. 2637. In balancing the public interest in preventing criminal activity against the individual's right to be free from arbitrary interference by law officers, courts must weigh the following factors: (1) the gravity of the public concerns served by the seizure; (2) the degree to which the seizure advances the public interest and (3) the severity of the interference with individual liberty. *Id.* at 50–51, 99 S.Ct. 2637.

■ ¶ 14 In *Michigan v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990), the Supreme Court addressed the propriety of D.U.I. roadblocks. In *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Supreme Court approved permanent checkpoints for the limited purpose of searching for illegal aliens. In *Brown v. Texas,* the Court balanced the public interest in preventing criminal activity against the individual's right to be free from arbitrary interference by law enforcement officers in evaluating the constitutionality of traffic checkpoints. We find that in balancing the individual's right to be free from unreasonable and arbitrary law enforcement interference against the public's interest in preventing criminal activity, the State, in this particular case, has failed to meet the standard set forth in *Brown* and its progeny.

¶ 15 It is not disputed that the drug interdiction checkpoints/roadblocks set up by the State are meant to intercept a completely random sample of drivers. There is no probable cause or articulable suspicion to stop any particular driver. Rather, like the sobriety checkpoints set up to intercept drunk drivers, the roadblock necessarily detains all who happen to drive through the checkpoint area, hoping to apprehend those who are the source of the problem and the object of the intrusion.

¶ 16 Although the record does not contain testimony as to the seriousness of the drug problem in this country, or more particularly, the State of Oklahoma, we are certain that there is no serious dispute that drug use, and abuse, is rampant, and constitutes a grave public danger. Likewise no one can seriously dispute the State's interest in eradicating

---

1. We note, however, peering into car windows and sniffing of the car by a dog outside the vehicle does not rise to the level of a search as that term of the Fourth Amendment has been interpreted by the Supreme Court. *See U.S. v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); *Texas v. Brown,* 460 U.S. 730, 739–740, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)(police officer's seizure of balloon suspected of containing illegal narcotics from automobile at routine driver's license checkpoint, held not to violate Fourth Amendment under "plain view" doctrine.)

this pervasive societal blight. As such, the initial tier of the *Brown* balancing test is easily met.

¶ 17 The second tier of the test weighs the degree to which the seizure advances the public interest. In this particular case we find that the appeal record does not provide sufficient support for this tier of the test, and therefore we do not reach the question of the severity of the seizure's interference with individual liberty. In *Michigan v. Sitz*, the Supreme Court chided the Michigan Court of Appeals for unfairly weighing, as part of the balancing analysis, the effectiveness of the proposed checkpoint program in actually apprehending drunk drivers. The court found the checkpoint program failed the "effectiveness" part of the test, weighing against the State's strong interest in implementing the program. *Sitz*, 496 U.S. at 453, 110 S.Ct. at 2487, 110 L.Ed.2d at 422. The Supreme Court clarified its position, noting that the cited passage from *Brown* was not meant to "transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Id.*

¶ 18 We are mindful of the Supreme Court's admonition against playing the numbers game in evaluating the "effectiveness" of a particular procedure for addressing a public danger. For example, standing alone, the number of drug arrests made, or not made, at a drug checkpoint, is not dispositive of the question of the procedure's effectiveness. However, to properly assess the degree to which the seizure advances the public interest, the appeal record presented to this Court for review should contain at least some specific information about the State's program, to include the factual basis upon which the decision was made to establish the checkpoint.

¶ 19 In presenting its argument to the District Court, the State acknowledged that it did not present *any* evidence as to the amount of drugs being seized on Oklahoma highways.[2] At one point, the State requested leave to put on evidence that "this is a problem in the State of Oklahoma, that drugs are being transported across our State lines and that they are being interdicted in large quantities up and down our highways."[3] Finally, the State volunteered that the largest drug shipment intercepted by the Tulsa County District Attorney's Task Force was, in counsel's recollection, four pounds of marijuana, while similar Oklahoma City checkpoints had taken in over $3.3 million dollars of controlled substances. Investigator Bell testified that numerous drug busts were attributable to the drug checkpoints, but the testimony was general in scope. Likewise, Bell's testimony that the State had arrested 75 to 80 people because of the drug checkpoints is meaningless without some further breakdown as to the nature of those arrests, the time frame in which they were made, the location of the arrests and the quantity and quality of the drugs confiscated. It could be that the 75 to 80 people arrested were arrested for transporting a single marijuana cigarette.

¶ 20 Mr. Bell testified that the State had conducted 13 drug checkpoints (over an unspecified period of time). It is unclear as to whether those 13 checkpoints were all conducted in Tulsa County, and, if so, whether they were all conducted at the same location. The record is void of the factual basis which led to the selection of the site for the drug checkpoint and the reasonableness of the decision to establish the checkpoint based on these facts. There was no information provided as to the time period covered by the checkpoints, or the type or quantity of drugs confiscated during these arrests. There was no delineation, in describing the number of arrests made, as to the nature of the arrests, the time frame for the arrests, the location of the arrests, etc. The general nature of the questioning could reasonably allow this Court to conclude that the "75 to 80" who have been arrested were arrested for something other than drug violations. If they were arrested for drug violations, again, we are in the dark as to who, what, when, where and how they were arrested. Assuming there were no arrests for those carrying personal-

---

2. Hearing transcript, July 15, 1999, p. 19—20.

3. Hearing transcript, July 15, 1999, p. 27.

use amounts of marijuana, it is unclear as to whether those 75 to 80 arrests included violators carrying personal use amounts of controlled dangerous substances. There was no follow-up testimony as to whether tickets were issued for illegal substances (ie., methamphetamine, cocaine, crack, etc.) found in amounts believed to be for personal use only, or if tickets were issued for personal users only when the substance found was marijuana.

¶ 21 Overall, while we recognize the State's legitimate interest in controlling and stopping the flow of illegal drugs across its borders and throughout the State, we do not find that the State, in this case, presented sufficient evidence to establish how its operation of this particular drug checkpoint advanced the public interest of halting drug trafficking.

¶ 22 **IT IS THEREFORE THE ORDER OF THIS COURT** that the order of the District Court of Tulsa County sustaining Appellee's motion to quash in Case No. CM–99–887, is **AFFIRMED.**

¶ 23 **IT IS SO ORDERED.**

/s/ Reta M. Strubhar
RETA M. STRUBHAR, Presiding Judge

/s/ Gary L. Lumpkin
GARY L. LUMPKIN, Vice Presiding Judge

/s/ Charles A. Johnson, Concur in Result
CHARLES A. JOHNSON, Judge

/s/ Charles S. Chapel, Concur in Result
CHARLES S. CHAPEL, Judge

/s/ Steve Lile
STEVE LILE, Judge