2001 OK CR 33

William McGAUGHEY, Appellant,

v.

STATE of Oklahoma, Appellee.

No. F–2000–595.

Court of Criminal Appeals of Oklahoma.

Nov. 9, 2001.

Francis R. Courbouis, Oklahoma City, OK, Attorney for Defendant.

Brett T. Burns, Assistant District Attorney, Chicaksha, OK, Attorney for the State.

Francis R. Courbois, Oklahoma City, OK, Attorney for Appellant.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer Blakeney Welch, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee.

## *OPINION*

CHAPEL, Judge:

¶ 1 William McGaughey is appealing two separate but similar cases. In Grady County Case No. CF–96–19, McGaughey was tried by the court, the Honorable James R. Winchester, and convicted of Trafficking in Illegal Drugs, under 63 O.S.Supp.1995, § 2–415 (Count I); Failure to Affix a Drug Tax Stamp, under 68 O.S.1991, § 450.8 (Count II); Unlawful Possession of Drug Paraphernalia, under 63 O.S.1991, § 2–405(B) (Count III); and Transporting a Loaded Firearm, under 21 O.S.Supp.1995, § 1289.13 (Count

V).[1] McGaughey was sentenced to 25 years imprisonment on Count I, 1 year imprisonment on Count II, 1 year imprisonment on Count III, and 6 months imprisonment on Count V, to be served concurrently with each other.

¶ 2 In the second case, Grady County Case No. CF–96–311, McGaughey was tried by the court, the Honorable James R. Winchester, and convicted of Possession of a Controlled Dangerous Substance With Intent to Distribute, under 63 O.S.Supp.1995, § 2–401(B)(1) (Count I); Failure to Affix a Tax Stamp, under 68 O.S.1991, § 450.8 (Count II); and Eluding a Police Officer, under 21 O.S.1991, § 540A (Count III). McGaughey was sentenced to 5 years imprisonment on Count I, 1 year imprisonment on Count II, and 6 months imprisonment on Count III, to be served concurrently with each other but consecutive with the sentences from Case CF–96–19.

## FACTS

### A. Case No. CF–96–19

¶ 3 At approximately 9:00 p.m. on January 23, 1996, Highway Patrol Trooper Tim Kimrey was traveling north on the H.E. Bailey Turnpike, when William Alfred McGaughey passed him in his truck, going south. Kimrey testified that he was going between 50 and 60 m.p.h. and that he recalls that McGaughey was not speeding, because he checked his speed with radar.[2] When Officer Kimrey looked in his rearview mirror after McGaughey passed him, it appeared to Kimrey that the taillights on the back of McGaughey's truck were not working. Kimrey then crossed the median, turned around, caught up to the truck, and turned on his lights to stop it.

¶ 4 Kimrey testified that McGaughey was driving a maroon 1989 GMC Extended Cab Pickup, which had a "Tommy Lift" on the back. He explained that a Tommy Lift is a type of tailgate that can be put on a vehicle after purchase. Kimrey testified that "once [he] had stopped the vehicle," he could see that the truck had a Tommy Lift on it and that "there were some covers with little slits in them," or "louvers" over the taillights.

¶ 5 Initially Officer Kimrey testified that "I could not tell until after I got him stopped and got out of the car and looked and saw what the problem was, whether he had tail lights or not," because the taillights were partially obscured by the Tommy Lift tailgate and the louvers. Kimrey acknowledged, however, that after he got out of his car, and before he approached McGaughey, he realized that McGaughey's taillights were working. Kimrey later admitted, on cross-examination, that he could see that at least one taillight was working when McGaughey started to pull over onto the shoulder.[3]

¶ 6 The defense put on evidence that McGaughey's truck had a valid safety inspection sticker on the night it was stopped and that it passed a subsequent safety inspection, with no alteration of the Tommy Lift or the taillights. The defense also put on evidence that McGaughey was never given a ticket for defective taillights and that he continued to drive the truck after the stop.[4]

¶ 7 After McGaughey stopped, Kimrey asked him to step out of the truck, and McGaughey came to the back of his truck. Kimrey told McGaughey that he had stopped him because he "couldn't see if he had any

---

1. McGaughey was also charged with Possession of a Firearm in Commission of a Felony, under 21 O.S.Supp.1991, § 1287 (Count IV); and Possession of a Sawed Off Shotgun, under 21 O.S. 1991 § 1289.18 (Count VI). Count VI was dismissed by the trial court; and the trial court found McGaughey not guilty of Count IV.

2. Kimrey also testified that he did not observe any evidence that McGaughey was intoxicated, either before or after the stop.

3. The section under which McGaughey was pulled over requires that all motor vehicles "be equipped with at least one tail lamp mounted on the rear, which, when lighted ..., shall emit a red light plainly visible from a distance of five hundred feet to the rear." *See* 47 O.S.1991, § 12–204(a).

4. In addition, a private investigator, who recreated the events of the night of January 23, 1996 and did various tests on the truck, testified that the only time that the taillights were not visible was when you were directly behind the truck and within approximately 25 feet.

tail lights or not." Kimrey testified that McGaughey said that "ever since they put that tailgate on ... those lights [have] been that way."[5] Kimrey then asked McGaughey for his driver's license, which was provided. Kimrey testified that he told McGaughey that he was "going to write him a warning for his taillights because you couldn't see them." He did not, however, actually write McGaughey a ticket or a warning.

¶ 8 Kimrey then walked to the passenger's side door and shined his flashlight across the windshield to check the truck's inspection sticker. After checking the inspection sticker, Kimrey had started walking back to the rear of the truck when he observed a pistol in the driver's side door pouch.[6] Kimrey asked McGaughey if it was his and if it was loaded; McGaughey responded "yes" to both questions. Kimrey asked if there were any other weapons or contraband or narcotics in the vehicle, to which McGaughey responded "no." Kimrey testified that he then asked if McGaughey would mind if he searched his truck, to which McGaughey responded "go ahead."[7]

¶ 9 Kimrey then removed the gun from the door panel, which was a fully loaded Ruger semi-automatic .9 mm pistol, unloaded it, and searched the truck. In the middle console between the two front seats, Kimrey found three bags of an off-white powder, subsequently determined to be amphetamine. Kimrey then got out of the truck, read McGaughey his rights, and placed him under arrest. When Kimrey patted McGaughey down, he discovered a large wallet with a chain, which contained over $6000 in cash.

¶ 10 After obtaining back-up help, Kimrey conducted an inventory search of the truck. Under the driver's seat he found a green military decontamination container that held

plastic baggies of an off-white powder, subsequently determined to be amphetamine.[8] He also found a blue money bag on the floorboard in front of the console, which contained $16,600 in cash and a set of digital scales. Kimrey found additional small baggies of amphetamine behind the right rear passenger's seat. The nine baggies of amphetamine found in the truck totaled 24.9 grams.

¶ 11 McGaughey filed a motion to suppress the evidence found in his truck, challenging the stop of his truck for the alleged taillight violation and the subsequent searches and discovery of evidence. After a bench trial Judge Winchester denied the motion, finding that "the trooper had a right to make an investigatory stop to check the mechanical safety of Defendant's vehicle."[9]

**B. Case No. CF–96–311**

¶ 12 Late in the evening on December 26, 1996, Officer Marlin Keys of the Ninnekah Police Department was on routine patrol, accompanied by Officer Shannon Ryans, when he observed a black 1985 Corvette pull out in front of him and go up onto the top of a center barrier median near the intersection of Highways 81 and 277. Keys then observed the Corvette make a left turn onto Highway 81 and pull over on the right side of the road. Keys testified that the Corvette hesitated when they passed it and that he decided to stop the driver because he thought from his actions that something could be wrong or he might be intoxicated. After they stopped the Corvette, the officers got out and approached the car, with Keys on the driver's side and Ryans on the passenger side.

¶ 13 When they reached the car, Keys asked the driver, William McGaughey, for his driver's license, proof of insurance, and if he

---

5. McGaughey testified at trial and denied making this statement.

6. Kimrey testified that when he stops a car he always checks the inspection sticker and briefly looks inside the vehicle. Kimrey also testified that when he looked into the interior of McGaughey's truck, he "was looking for whatever may have been there which could have been-might have been nothing."

7. McGaughey acknowledged at trial that he told Kimrey that the gun in the truck was loaded and was his, but denied being asked for or giving permission to search his truck.

8. McGaughey testified that after Kimrey found the bags in the console and asked if there were any more drugs in the truck, he told Kimrey where to find the green military container.

9. O.R. 122.

was all right.[10] McGaughey handed him the license and insurance form and made a comment about thinking the officers were Robert Jolley, another officer in Ninnekah. Keys then went back to his car to check the validity of McGaughey's license and whether there were any warrants for his arrest. After determining that his license was valid and that there were no warrants for his arrest, Keys went back and asked McGaughey if he had been drinking or taking any drugs, to which he responded "hell no." Keys then asked McGaughey to step out of his car to take a field sobriety test. At that point McGaughey said "hell no" again and sped off. The officers ran back to their car, and the chase was on.

¶ 14 They radioed their dispatcher that they were in pursuit of a vehicle, and other officers from the area prepared to assist. Keys chased the Corvette at speeds up to 90 and 100 miles per hour. After about three miles they lost the Corvette near the town of Norge. Within approximately ten minutes, however, Officer Powell of the Chickasha Police Department, who had been monitoring the pursuit, radioed that he had found the Corvette (with identical license plate) parked outside a residence in Norge, with no one inside. The doors to the car were closed, but the driver's side window was open. Officer Powell and Grady County Deputy Keith Cleghorn were there when Keys and Ryans arrived.

¶ 15 The Corvette was parked on the east side of the residence of Lorraine McHugh. When the officers knocked on her door and asked if she knew whose vehicle was parked next to her house, she denied knowing whose car it was. The officers obtained permission to search McHugh's home for the driver, but they did not find McGaughey inside. The

officers also searched the area but were unable to find McGaughey, even when they searched the house a second time.

¶ 16 Keys testified that although he shined his flashlight into the Corvette and observed a red duffel bag, which was open and had several visible syringes in it, he did not search the car at that time. Officer Powell testified that he reached through the open window and removed a wallet to see if it contained identification. When Powell opened the wallet and saw a substantial amount of cash inside, he closed it up and threw it back in the car. According to the officers who testified at trial, this was the only search of the car at that time.[11]

¶ 17 Keys testified that he "secured" the Corvette by rolling up the window, locking the doors, and removing the keys. He then called a wrecker to tow the car to the Grady County Sheriff's Office Warehouse, so that they could get a search warrant. Keys acknowledged that at the time the car was towed, he knew that it was owned and had been driven by William McGaughey, based upon the insurance verification and driver's license that McGughey had given him and that Keys still possessed. In addition, after Officer Jolley arrived on the scene, McHugh admitted that she did know who owned the Corvette and that it was McGaughey.[12] Keys acknowledged that the Corvette was parked on private property and that it was not obstructing traffic or in violation of any parking ordinances at the time it was towed. Keys also acknowledged that McHugh did not ask them to remove the car from her property.

¶ 18 Keys testified that he followed the car to the Sheriff's storage lot and waited there with it until a search warrant was obtained from Judge Oteka Alford.[13] After the search

10. McGaughey was out on bond on his other case at the time.

11. Lorraine McHugh and her 13 year-old son Kenny testified that the officers had the doors of the Corvette open and "dug through it" for a long time. They also testified that when Powell found the wallet, he tossed it on top of the car, opened it up, and then stated, "Dope money. That's all I need. Good enough for me." All of the officers denied making or hearing this statement.

12. Apparently Officer Jolley knew McHugh socially and knew that she had previously dated McGaughey.

13. The parties are in agreement that a search warrant was obtained before McGaughey's car was searched after the impound. Neither party seems to realize, however, that the affidavit for search warrant, search warrant, and search warrant return that are attached to the trial transcript in this case, which were apparently intended to be copies of the relevant search warrant

warrant was obtained, Keys searched the car and found the wallet, containing $610 in cash, a phone bill with McGaughey's name on it, and two mobile telephones. Inside the red duffel bag he found a black container with what appeared to be cocaine inside, as well as syringes. The parties stipulated at trial that the substance in the black container was 7.2 grams of cocaine. McGaughey filed a motion to suppress the evidence found in the Corvette, which was denied after a bench trial.

### ANALYSIS

¶ 19 McGaughey's only argument on appeal in both cases is that his motion to suppress should have been granted, because the drug and other evidence against him was obtained through a violation of his Fourth Amendment and Oklahoma Constitutional rights against unreasonable searches and unreasonable seizures.[14] Although the circumstances and legal analyses of the two cases are quite different, we conclude that each case involved an illegal seizure, followed by a search(es) that resulted in the discovery of the incriminating evidence. The question then is whether the illegal seizure tainted the subsequent discovery of incriminating evidence. We conclude that in the first case, where McGaughey was stopped for what appeared to be improper taillights, the circumstances of the stop constituted an illegal seizure and that this illegality tainted the subsequent discovery of evidence, including McGaughey's consent to search the truck. In the second case, we conclude that McGaughey's car was illegally impounded (i.e., illegally seized), but that this illegality did not taint the subsequent search of his car, which was accomplished via a search warrant.

### A. Case No. CF–96–19

¶ 20 McGaughey argues on appeal that the traffic stop of his truck was unfounded and

illegal; hence the drugs and loaded gun found in subsequent searches should have been suppressed. McGaughey makes two basic arguments regarding the stop: (1) that Officer Kimrey could not, in fact, have observed his truck in the manner alleged without also seeing that at least one of his taillights was working; consequently, he had no authorization for initially pulling him over; and (2) that even if Officer Kimrey's initial decision to pull him over was justified, Kimrey had no legal authority to detain McGaughey after he observed that the truck's taillights were operational.

¶ 21 The first claim, though vigorously contested at trial and at oral argument, clearly fails. Whether Officer Kimrey could have seen McGaughey's truck that night and concluded, at least for a time, that neither of its taillights were working is a determination of fact; and the evidence presented at trial adequately supported Kimrey's testimony that, at least initially, he could not see any operational taillights on McGaughey's truck. Hence the legality of Kimrey's actions in initially turning on his lights to pull McGaughey over, at a time when Kimrey maintains he had not yet realized that either of the truck's taillights were working, is not a substantial issue on appeal.

¶ 22 The key question on appeal comes from McGaughey's second challenge-whether after Officer Kimrey realized that he had made a mistake and that the truck's taillights were in fact operational, he was authorized to ask McGaughey to get out and come to the back of the truck, request his license, check the validity of the truck's inspection sticker, and then briefly survey the interior of the truck. If all of these actions were justified, McGaughey does not seriously challenge the legitimacy of the events which followed, namely, the plain view observation of the gun in the door panel, which McGaughey ac-

documents (State's Exhibits 2, 3, and 4, respectively), are actually copies of search warrant documents for a search of McGaughey's home in the other case. In fact, the search warrant documents applicable to the search of McGaughey's car are not contained anywhere within the Record before this Court. Fortunately, McGaughey's claims can be resolved without viewing the missing documents.

14. Although McGaughey's appeal references Article 2, Section 20 of the Oklahoma Constitution, this Court interprets his argument as invoking Article 2, Section 30 of the Oklahoma Constitution, which is the provision dealing with unreasonable searches and seizures. See Okla. Const. Art. 2, § 30.

knowledged to be loaded, followed by the finding of the drugs, cash, and digital scales in various parts of the truck.[15] Hence the resolution of McGaughey's appeal depends upon the legality of Officer Kimrey's actions in continuing the seizure of McGaughey and his truck once Kimrey realized that McGaughey's taillights were working properly.

¶ 23 The issue presented is whether an officer who stops a vehicle based upon a reasonable but mistaken belief that the vehicle or its driver has violated or is violating a traffic law (or other law) can continue the traffic stop after the officer realizes his mistake, where no other justification for continuing the stop has yet emerged.[16] Neither this Court nor the United States Supreme Court has addressed this specific issue, though both courts have decided a number of cases that govern the analysis and suggest how it should be resolved. In addition, the Tenth Circuit Court of Appeals and a number of state courts have addressed the specific question at issue here; and these decisions will be discussed below.

■ ¶ 24 It should be recognized at the outset that McGaughey and his truck were definitely "seized," for Fourth Amendment purposes, when Kimrey turned on his lights and pulled McGaughey over.[17] The Supreme Court has found that such traffic stops should be treated as "investigative stops" akin to the investigative detentions that were first sanctioned in *Terry v. Ohio*.[18] Consequently, although such stops do not require the sort of "probable cause" that is necessary in the case of an actual arrest, stopping an individual vehicle normally requires "at least articulable and reasonable suspicion" that the car or its driver is in violation of the law.[19] In *United States v. Sharpe*, the Supreme Court recognized that the test for evaluating the constitutionality of traffic stops is the two-part test articulated in *Terry:* (1) "whether the officer's action was justified at its inception," and (2) whether the officer's subsequent actions were "reasonably related in scope to the circumstances which justified the interference in the first place." [20]

### 1. *Initial Justification for Stop*

■ ¶ 25 In terms of the initial justification for a traffic stop, the Supreme Court has recognized that "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." [21]

---

**15.** Although McGaughey continues to deny that he gave Kimrey consent to search his truck, Kimrey testified that McGaughey told him to "go ahead" when asked for consent. The voluntariness of this consent, however, will be addressed *infra*.

**16.** Kimrey acknowledged at trial that the only reason he stopped McGaughey was for a possible taillight violation and that prior to finding the gun, he had no other reason to be suspicious of McGaughey.

**17.** See *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) ("[S]topping an automobile and detaining its occupants constitute a 'seizure' within the meaning of [the Fourth and Fourteenth] Amendments even though the purpose of the stop is limited and the resulting detention quite brief."); *see also United States v. Brignoni–Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Whren v. United States*, 517 U.S. 806, 809–10, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *State v. McNeal*, 2000 OK CR 13, 6 P.3d 1055, 1057. In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Supreme Court noted that "[u]nder the law of most States, it is a crime ... to ignore a policeman's signal to stop one's car" and that "few motorists would feel free ... to disobey a directive to pull over." *Id.* at 436, 104 S.Ct. 3138.

**18.** *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In *United States v. Sharpe*, the Supreme Court used the term "investigative stops of vehicles" to describe what are typically called "traffic stops." 470 U.S. at 682, 105 S.Ct. 1568.

**19.** *Prouse*, 440 U.S. at 663, 99 S.Ct. 1391.

**20.** *Sharpe*, 470 U.S. at 682, 105 S.Ct. 1568 (quoting *Terry*, 392 U.S. at 20, 88 S.Ct. 1868).

**21.** *Whren*, 517 U.S. at 810, 116 S.Ct. 1769; *see also United States v. Botero–Ospina*, 71 F.3d 783, 787, (10th Cir.1995), *cert. denied*, 518 U.S. 1007, 116 S.Ct. 2529, 135 L.Ed.2d 1052 (1996) (en banc) ("[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.") (quoted approvingly in *Lozoya v. State*, 1996 OK CR 55, 932 P.2d 22, 32).

The Supreme Court has further held that where an officer has probable cause to believe that a traffic violation has occurred, his subjective motivation for actually stopping a particular vehicle is irrelevant to the legality of the stop.[22] In other words, if an officer's action was "objectively justifiable behavior," because he had probable cause to believe that a driver had violated or was violating some traffic law, stopping the driver's vehicle is lawful regardless of the officer's subjective motivation for the stop.[23]

¶ 26 Under this criteria, Officer Kimrey's initial decision to stop McGaughey's truck, at a time when he believed that it did not have any operational taillights, certainly passes the first part of the *Terry/Sharpe* test. His decision to turn on his lights to stop McGaughey's truck was objectively justifiable behavior, based upon Kimrey's initial perception that McGaughey's truck was in violation of Oklahoma's statute requiring at least one operational taillight.[24] Hence the initial stop of McGaughey's truck was justified.

### 2. *Relationship Between Justification for Stop and its Scope and Duration*

 ¶ 27 Under the second part of the *Terry/Sharpe* test, we then ask whether Officer Kimrey's subsequent actions were reasonably related in scope to the circumstances that justified the stop in the first place. The Supreme Court has recognized that in the case of a traffic stop, like a *Terry* stop, both "the stop *and the inquiry* must be 'reasonably related in scope to the justification for their initiation.'"[25] In *Florida v. Royer*,[26] the Supreme Court emphasized that the length and scope of an investigative detention cannot expand beyond the justification for the initial stop:

> This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.... It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.[27]

Hence an officer whose initial reasonable suspicion has been dispelled, and who has no other reasonable suspicion or probable cause to justify detaining an individual, has no authority to continue detaining that individual.[28] A detention that continues beyond the point at which an officer determines that his initial rationale for the stop was mistaken can no longer be considered "reasonably related in scope" to the initial justification for that intrusion. Furthermore, it is the State's burden to establish that a particular investiga-

**22.** *See Whren*, 517 U.S. at 811–13, 116 S.Ct. 1769.

**23.** *Id.* at 812–13, 116 S.Ct. 1769.

**24.** *See Lozoya*, 1996 OK CR 55, 932 P.2d 22, 31–32 (stop of car for failure to dim headlights, which violates Oklahoma law, was valid traffic stop); *Skelly v. State*, 1994 OK CR 55, 880 P.2d 401, 404 (officer's observation that Skelly car had broken tag light "provided probable cause for the initial stop," because broken tag light was "traffic violation committed in his presence"). The *Skelly* case is discussed in detail *infra*, in the analysis of McGaughey's appeal of his other case.

**25.** *Brignoni–Ponce*, 422 U.S. at 881, 95 S.Ct. 2574 (emphasis added) (quoting *Terry*, 392 U.S. at 29, 88 S.Ct. 1868).

**26.** *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

**27.** *Id.* at 500, 103 S.Ct. 1319 (internal citations omitted). *See also Sharpe*, 470 U.S. at 686, 105 S.Ct. 1568 (rejecting rigid time limitations, but noting that when assessing duration of investigative detention, it is "appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly"); *United States v. Wood*, 106 F.3d 942, 945 (10th Cir.1997) ("An investigative detention must be temporary, lasting no longer than necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification.") (citing *Royer* ).

**28.** We note that this conclusion complies with the recently stated Supreme Court preference for Fourth Amendment rules that are "readily administrable" and "sufficiently clear and simple," so as to be easily understood and applied by both officers on duty and courts on review. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 121 S.Ct. 1536, 1553–54, 149 L.Ed.2d 549 (2001).

tive detention did not continue beyond the time period in which an officer's original reasonable suspicion was dispelled (and no additional reasonable suspicion had emerged).

¶ 28 Neither the Supreme Court nor this Court has directly addressed the situation where an officer pulls an individual vehicle over based upon a reasonable but mistaken belief that a traffic violation has occurred, only to quickly realize-before substantial communication or interaction with the driver-that his initial perception was mistaken. The closest Oklahoma case appears to be *Lucas v. State.*[29] In *Lucas,* this Court found that where an officer initially stopped a car based upon the officer's reasonable articulable suspicion that the woman passenger in the vehicle had been assaulted by the male driver,[30] "[o]nce the officers were assured by the appellant and his wife that everything was fine, the reason for the detention terminated."[31] The Court held that marijuana and a loaded gun that were found in a subsequent search of the car should have been suppressed.[32] Hence this Court upheld the principle that when the initial justification for the stop has been resolved, the stop must end.

¶ 29 In *United States v. McSwain,*[33] the Tenth Circuit Court of Appeals addressed the situation where an officer discovers, before substantial interaction with the driver, that his reason for stopping a particular vehicle was mistaken. In *McSwain,* a Utah highway patrol trooper stopped a car because he noticed that it did not have either front or rear licenses plates and he was unable to read the expiration date on the temporary registration sticker in the rear window, which appeared to be covered with reflective tape. As the officer approached the car, however, he determined that the temporary registration was valid and that the reflective material was simply a new device used by the State of Colorado to prevent alteration of the sticker's expiration date. Nevertheless, the officer approached the driver, questioned him about why he was driving the car, and requested identification and vehicle registration. The driver, McSwain, produced a Colorado registration in his name and identification, though he stated that he did not have a driver's license. A passenger then produced his driver's license. The officer continued questioning McSwain and the passenger about where they had been, ran a criminal history check on McSwain (which revealed that his driver's license was suspended and that he had a criminal record of drug and gun violations and assaults), and after asking if they were "packing" any alcohol, firearms, or drugs in the car, asked for and received consent to search the car.[34] During this search the officer found a gun, a set of scales, and a bag of crack cocaine.[35]

¶ 30 The Tenth Circuit Court applied the two-part *Terry/Sharpe* test and concluded that although McSwain conceded the propriety of the initial stop, the detention of McSwain following the officer's discovery that his temporary registration was valid violated the Fourth Amendment:

> Trooper Avery stopped Mr. McSwain for the sole purpose of ensuring the validity of the vehicle's temporary registration sticker. Once Trooper Avery approached the vehicle on foot and observed that the temporary sticker was valid and had not expired, the purpose of the stop was satisfied. Trooper Avery's further detention of

---

29. *Lucas v. State,* 1985 OK CR 100, 704 P.2d 1141.

30. The officer had received a report that a man was observed beating a woman in a green Ford at a particular location, and the officer subsequently stopped a green Ford and observed the male driver making threatening gestures and movements that caused the officer to believe he was looking for a weapon. During the stop the man admitted to grabbing his wife by the hair and pulling her back into the car when she attempted to leave. The woman, however, stated that she was fine, that she did not want to file

charges against her husband, and that he did not have a weapon in the car. *Id.* at 1142.

31. *Id.* at 1143.

32. *Id.* at 1143.

33. *United States v. McSwain,* 29 F.3d 558 (10th Cir.1994).

34. The consent issue will be addressed *infra.*

35. *Id.* at 559–60.

the vehicle to question Mr. McSwain about his vehicle and travel itinerary and to request his license and registration exceeded the scope of the stop's underlying justification.[36]

The court recognized that "Trooper Avery's reasonable suspicion regarding the validity of Mr. McSwain's temporary registration sticker was completely dispelled *prior* to the time he questioned Mr. McSwain and requested documentation."[37] Thus the court concluded that Avery's actions "in questioning Mr. McSwain and requesting his license and registration exceeded the limits of a lawful investigative detention and violated the Fourth Amendment."[38]

¶ 31 In addition, the highest state courts in Colorado,[39] Ohio,[40] and Oregon,[41] as well as appellate courts in Florida[42] and Washington,[43] have all held that when an officer reasonably but mistakenly stops a vehicle that he believes has violated a traffic law, upon discovering that the stopped vehicle is *not* in violation of the law, the officer no longer has any authority to further detain the driver or even to seek the driver's license, insurance, or registration documents.[44] We have found only one jurisdiction that has

---

**36.** *Id.* at 561.

**37.** *Id.* (emphasis in original).

**38.** *Id.* at 561–62; see also *Gross v. Pirtle*, 245 F.3d 1151, 1157 (10th Cir.2001) (citing *McSwain* as holding that "after purpose of the traffic stop ended, reasonable suspicion no longer existed and further detention of the driver exceeded the permissible scope").

**39.** In *People v. Redinger*, 906 P.2d 81 (Colo.1995) (en banc), a highway patrol officer stopped a car because he did not see a license plate or temporary sticker on it. As he approached the car, however, he observed a valid temporary registration plate properly displayed in the rear window. The officer then approached the driver, explained why he had stopped the car, and asked for the driver's license, registration, and proof of insurance. When the driver pulled out his wallet, a small bag of a white powdery substance (later determined to be methamphetamine) fell out. *Id.* at 82. The Supreme Court of Colorado ruled that the drug evidence was properly suppressed, concluding that "when [the officer] realized his initial observation was erroneous, the purpose of the investigatory stop was satisfied and the officer no longer had any reason to detain and interrogate Redinger." *Id.* at 84. The court cited various other courts as having "also recognized that once the purpose of an initially valid investigatory stop has been satisfied, any further detention or questioning of the driver ... constitutes unreasonable and therefore unlawful detention prohibited by the Fourth Amendment." *See id.* at 85 (citations omitted).

**40.** *See State v. Chatton*, 11 Ohio St.3d 59, 463 N.E.2d 1237, 1238–41 (1984) (per curiam) (officer who stopped vehicle that had no visible license plates had no authority to further detain driver or ask for his driver's license after he determined that car had valid temporary vehicle permit), *cert. denied*, 469 U.S. 856, 105 S.Ct. 182, 83 L.Ed.2d 116 (1984); *id.* at 1240 ("In our view, because the police officer no longer maintained a reasonable suspicion that appellee's vehicle was not properly licensed or registered, to

further detain appellee and demand that he produce his driver's license is akin to the random detentions struck down by the Supreme Court in *Delaware v. Prouse*.") (citation omitted).

**41.** *See State v. Farley*, 308 Or. 91, 775 P.2d 835, 836 (1989) (officer who stopped vehicle that had no visible license plates had no authority to further detain driver or ask for his driver's license after he determined that vehicle had valid temporary vehicle permit).

**42.** *See Powell v. State*, 649 So.2d 888, 889 (Fla. Dist.Ct.App.1995) (officer who stopped vehicle that had no visible tag on it had no authority to detain driver, while he got drug dog out of his own vehicle, after he determined that stopped vehicle had valid temporary tag).

**43.** *See State v. DeArman*, 54 Wash.App. 621, 774 P.2d 1247, 1247–49 (1989) (officer who initially believed that vehicle might be disabled, because it remained motionless at stop sign for approximately one minute, had no authority to detain, question, or seek identification from driver once it became clear that vehicle not disabled).

**44.** The position of the Texas Court of Criminal Appeals on this issue is unclear. In *Davis v. State*, 947 S.W.2d 240 (Tex.Crim.App.1997), it found that a driver was illegally detained after officers determined that he was not intoxicated. The court wrote: *"This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."* *Id.* at 243 (emphasis in original). Yet in a footnote the court stated that "in a traffic stop situation, an officer may demand identification, a valid driver's license, and proof of insurance from the driver." *Id.* at 243 n. 6 (citations omitted). The *Davis* court did not specifically address whether such a request is valid where (as in *Davis*) the purpose of the stop is completed prior to the request for documentation. *See id.* at 241 (officers determined that driver not intoxicated prior to request for documents).

clearly held that an officer can continue to detain a vehicle and its occupants even after the officer discovers that his initial reason for the traffic stop was mistaken, and even though no new justification for the continued detention has arisen. That jurisdiction is Maine.

¶ 32 The Supreme Court of Maine takes the position that "[a]fter an officer stops a vehicle, he may request verification of the operator's right to drive, even when the original reason for a stop has disappeared, or evaporated, before the request is made." [45] Although the Maine Supreme Court has taken this position in multiple cases,[46] none of these cases explain how this position is consistent with the Fourth Amendment's requirements (1) that the scope and duration of a traffic stop be "reasonably related" to the initial justification for the stop (*Terry/Sharpe*) and (2) that an investigative detention "last no longer than is necessary to effectuate the purpose of the stop" (*Royer*).[47]

¶ 33 This Court concludes that although the Maine approach may appear reasonable as a matter of public policy, it is incompatible with the requirements of the Fourth Amendment and Article II, Section 30 of the Oklahoma Constitution.[48]

¶ 34 Turning to the case at hand, we find that Officer Kimrey's perception that the truck's taillights were not working justified the initial stop of McGaughey's truck. The problem is that the entire investigation of whether the taillights were working or not was completed before Kimrey ever interacted with McGaughey and long before he observed the gun in the driver's door pouch. Kimrey acknowledged observing that at least one of the truck's taillights was working when McGaughey began to pull over, and that he saw that both taillights were working as he exited his own car and approached the truck. At that point Officer Kimrey had no further authority to detain McGaughey or his truck.

■ ¶ 35 Although an officer effecting a valid traffic stop can require a driver to exit his car [49] and produce his license,[50] and can check the validity of the inspection sticker on that vehicle,[51] an officer who realizes that his stop of a vehicle was mistaken-and who has no other cause for reasonable suspicion of the driver-has no authority to further detain the driver or his vehicle. The seizure becomes

---

45. *State v. Gulick*, 759 A.2d 1085, 1088 (Me. 2000).

46. *See id.; State v. Huether*, 748 A.2d 993, 996 (Me.2000); *State v. Hill*, 606 A.2d 793, 794–96 (Me.1992).

47. In *Hill*, the Maine Supreme Court quoted the appropriate two-part *Sharpe/Terry* test and recognized that post-seizure police conduct "must be justified under the second *Terry* prong...." *Id.* at 795. It then failed to explain how asking a driver for his license and registration could be "reasonably related in scope to the circumstances which justified the interference in the first place," after the officer determined that his initial belief that the vehicle lacked a rear license plate was mistaken. *See id.* at 795–96. Instead, the court simply engaged in a general "reasonableness" inquiry, in which it "balanced" the public and private concerns involved, and concluded that "the minimal further intrusion of asking Hill for the documents ... did not unreasonably intrude on Hill's fourth amendment rights." *Id.* at 795.

The Maine Supreme Court's later decisions in *Huether* and *Gulick* followed this same approach. *See Huether*, 748 A.2d at 996 (quoting *Hill* and stating simply that its analysis "applies equally to the present case"); *Gulick*, 759 A.2d at 1087–90

(relying on *Hill* and *Huether*); *id.* at 1090 n. 9 (invoking "common sense" and finding that it would be "unrealistic and counterproductive to require law enforcement to stop at each new question to determine whether articulable suspicion has 'evaporated' ").

48. As the Supreme Court recognized in *Arizona v. Hicks*, 480 U.S. 321, 329, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987), "there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all."

49. *See Pennsylvania v. Mimms*, 434 U.S. 106, 109–11, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (per curiam) (where vehicle "lawfully stopped" for expired license tags, officer can order driver to get out of car during stop).

50. *See Prouse*, 440 U.S. at 659, 99 S.Ct. 1391 (during vehicle stop for traffic violation, "licenses and registration papers are subject to inspection").

51. *See New York v. Class*, 475 U.S. 106, 119, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (finding that in case of "undoubtedly justified traffic stop," officer could lawfully move papers that obscured automobile's vehicle identification number).

illegal at the point where its initial justification has ceased and no new justification has arisen.

¶ 36 The seizure of McGaughey and his truck became illegal at least by the time that Officer Kimrey got out of his car and saw that both of the truck's taillights were working, and arguably after Kimrey first saw that at least one taillight was working, as McGaughey began to pull over. Consequently, Kimrey's subsequent actions of asking McGaughey to get out of the vehicle, requesting his driver's license, checking the truck's inspection sticker, and then briefly surveying the interior of the truck were all illegal. The discovery of the gun, drugs, money, and digital scales within McGaughey's truck all occurred as a result of the illegal seizure of McGaughey's truck.

### 3. *Consent to Search*

■ ¶ 37 The only question remaining is whether McGaughey's consent to search the truck, after Kimrey first found the gun, was sufficiently voluntary to "purge" the drug, cash, and scale evidence of the taint of the illegal seizure.[52] In *Florida v. Royer*,[53] the Supreme Court addressed the situation where consent to search is given while an individual is being unlawfully detained. The Court noted that "where the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given...."[54] The Court concluded that because Royer "was being illegally detained when he consented to the search of his luggage," his consent "was tainted by the illegality and was ineffective to justify the search."[55]

¶ 38 The Tenth Circuit Court of Appeals reached the same conclusion in its *McSwain* decision (discussed earlier),[56] in a situation parallel to the one before this Court. The question before that court was "whether Mr. McSwain's consent to the search of his vehicle cleansed the taint of the unlawful detention, thereby validating the search."[57] After finding that McSwain and his car were being illegally detained (after the initial reason for the stop of his car had been resolved), the court further found that McSwain's response of "Go ahead," to an officer's request for consent to search his car, did not constitute an adequate consent to search.[58] The *McSwain* court considered three factors to be especially relevant to its determination: (1) the temporal proximity of the illegal detention and the consent, (2) any intervening circumstances, and (3) the purpose and flagrancy of the officer's unlawful conduct.[59] The court concluded that McSwain's consent "was not sufficient to purge the taint of his illegal detention."[60]

¶ 39 We reach the same conclusion in the current case. As in *McSwain*, we find that the first two factors "weigh heavily against finding the taint cleansed" and suggest that "there was no 'break in the causal connection between the illegality and the evidence thereby obtained.'"[61] In this case, as in *McSwain*, only a few minutes had passed between the illegal detention and the request for consent.[62] This short period of time suggests a decreased likelihood that McGaughey's consent was voluntary. Furthermore, the only significant "intervening circumstance" between the beginning of McGaughey's illegal detention and his alleged con-

---

52. Because the gun was found before consent was given, the consent issue does not impact McGaughey's conviction for transporting a loaded firearm.

53. *Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

54. *Id.* at 497, 103 S.Ct. 1319.

55. *Id.* at 507–08, 103 S.Ct. 1319.

56. *McSwain*, 29 F.3d 558 (10th Cir.1994).

57. *Id.* at 562.

58. *Id.* at 560, 562–64. Interestingly, the phrase "go ahead" was also alleged as a statement of consent in the *Royer* case, *see* 460 U.S. at 494, 103 S.Ct. 1319, and in the case before this Court.

59. *Id.* at 562, 103 S.Ct. 1319 (citing *Brown v. Illinois*, 422 U.S. 590, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).

60. *Id.* at 562–63, 95 S.Ct. 2254.

61. *Id.* at 563, 95 S.Ct. 2254 (citation omitted).

62. *Id.*

sent to search was Kimrey's finding of the gun in McGaughey's truck and McGaughey's admission that it was loaded. We find that this circumstance further decreased the likelihood that consent to search was freely and voluntarily given, since McGaughey had effectively just admitted to committing a crime that could subject him to arrest. We do not find, however, that Officer Kimrey's conduct (beyond the illegal detention) was otherwise flagrant, improper, or suggestive of an illegal purpose.[63]

¶ 40 Weighing these factors together, we hold that the evidence before the district court was not sufficient for the State to meet its burden of showing that McGaughey's consent was voluntary. The totality of the circumstances, including the fact that McGaughey had been told that he was going to be ticketed, had been ordered to remain outside his truck, and had surrendered his driver's license, in addition to the factors noted above, all suggest that McGaughey did not freely consent to the search of his truck.[64] Consequently, McGaughey's consent to search did not purge the taint of the prior unlawful detention.

¶ 41 All of the evidence found in McGaughey's truck was found as a direct result of Officer Kimrey's illegal detention of the truck. Consequently, all of these "fruits" of the illegal detention (*i.e.*, the gun, drugs, cash, and scales) should have been suppressed; and McGaughey's convictions for trafficking in illegal drugs, failure to affix a drug tax stamp, unlawful possession of drug paraphernalia, and transporting a loaded firearm must be reversed.

**B. Case No. CF–96–311**

¶ 42 McGaughey argues on appeal that the district court should have granted his motion to suppress the evidence found in his car because (1) his car was illegally searched prior to being impounded; (2) the impoundment of his car was illegal; and (3) the search of his car subsequent to impound, though with a warrant, was also illegal.[65]

¶ 43 McGaughey argues, based upon the testimony of McHugh and her son, that the officers actually searched his car prior to the impound and that evidence improperly obtained from this search was the basis for and tainted the warrant obtained after the impound. This claim has no merit. The officers denied searching the Corvette prior to impound, and the trial court, as the trier of fact, was entitled to credit their testimony over that of McHugh and her son. In addition, Officer Keys testified that when he shined his flashlight into the car, he observed syringes in plain view in an open duffel bag. This was clearly legal.[66]

¶ 44 The impound of McGaughey's car, however, was not legal. This Court and the Supreme Court have repeatedly recognized the legitimacy of automobile impounds and subsequent inventory searches in cases where a vehicle is left on a public street and some specific law, ordinance, or police department policy authorizes the impound and inventory.[67] This Court has also repeatedly

---

**63.** *Cf. id.* at 563–64, 95 S.Ct. 2254 (finding officer's actions suggested a purposeful "fishing expedition").

**64.** Although the Supreme Court has held that an officer does not have to tell a driver who has been validly stopped for a traffic offense that he is "free to go," in order to find that the driver's consent to a search was voluntary, *see Ohio v. Robinette*, 519 U.S. 33, 35, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), the Court recognized that "knowledge of the right to refuse consent is one factor to be taken into account" in assessing the voluntariness of a consent. *Id.* at 39, 117 S.Ct. 417 (citation omitted). No evidence in the record suggests that McGaughey was informed that he was free to leave or to decline Kimrey's request for consent to search his truck.

**65.** These claims have no impact on McGaughey's conviction for eluding officers, which did not rely on any evidence from the challenged searches, and which McGaughey essentially admitted.

**66.** *See Texas v. Brown*, 460 U.S. 730, 739–40, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (finding it "beyond dispute" that officer's use of flashlight to illuminate interior of car "does not constitute a search, and thus triggers no Fourth Amendment protection").

**67.** *See, e.g., South Dakota v. Opperman*, 428 U.S. 364, 369, 372, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976) (recognizing "authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience" and to perform inventories of impounded vehicles "pursuant to standard police proce-

held, however, that a car on private property cannot be impounded absent a request from the property owner or other specific authorization. In *Kelly v. State*,[68] this Court stated, "The decision to impound on private property does not properly rest with the police officer. It is incumbent upon the owner of the private property to request removal of a car if he deems it a nuisance or a trespass."[69] The *Kelly* decision held that the impound of a car from a private parking lot, solely on the basis of an altered license tag, was illegal and that the marijuana found in a subsequent inventory search should have been suppressed.[70]

¶ 45 In *Skelly v. State*,[71] a case involving a number of different searches and seizures, Barbara Skelly challenged her conviction for possession with intent to distribute marijuana, which originated in a routine traffic stop of the car she was riding in with her husband. Although this Court upheld the search of Mrs. Skelly and her handbag at the scene, based upon drug materials observed in plain view in her open handbag and the "plain smell" of marijuana smoke, we found that the impound of the Skelly car was illegal and that the marijuana and other evidence of drug selling found in subsequent searches of the car should have been suppressed.[72]

¶ 46 Our *Skelly* decision noted that "the Fourth Amendment protects people from both unreasonable searches *and* unreasonable seizures,"[73] and that "impoundments must be conducted in strict compliance with applicable law in order for the consequent inventory search to be legal."[74] The Skelly car had been parked on private property (a motel parking lot) at the time of the impound, and the State conceded that the property owner had not requested the impound.[75] This Court concluded that the car was illegally seized and that the illegality of the seizure tainted both the subsequent inventory search and a later search done after a search warrant was obtained.[76] Hence obtaining a warrant to search a car that has been illegally seized (through an unauthorized impound) does not necessarily "untaint" a subsequent search of that car.

¶ 47 Decisions like *Kelly* and *Skelly* make clear that the impound of McGaughey's car from McHugh's yard constituted an illegal seizure of the car.[77] The State does not offer any law, ordinance, or police department policy authorizing the impound, nor does it claim that McHugh requested that the car be

---

dures"); *Colorado v. Bertine*, 479 U.S. 367, 374 n. 6, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987) (all inventory searches must be conducted "according to standardized criteria"); *State v. Shorney*, 1974 OK CR 130, 524 P.2d 69, 71 (municipalities have authority to authorize impounds where driver arrested and vehicle left on city street); *Tomlin v. State*, 1994 OK CR 14, 869 P.2d 334, 342 (vehicle impounds and inventory searches subject to constitutional scrutiny; authorities can impound in exercise of "community care-taking functions" and where vehicle is evidence of crime).

68. *Kelly v. State*, 1980 OK CR 7, 607 P.2d 706.

69. *Id.* at 708.

70. *Id.* at 707–09; *see also Lee v. State*, 1981 OK CR 59, 628 P.2d 1172, 1173 (finding impound of car from private property and subsequent inventory search illegal, where no police department guidelines authorized impound) (relying on *Kelly* ).

71. *Skelly v. State*, 1994 OK CR 55, 880 P.2d 401.

72. *Id.* at 405–07. We found that the impound was illegal even though both of the Skellys were arrested at the scene and even though a trained

drug-detecting dog "hit" on each side of the car before the impound. *Id.* at 404.

73. *Id.* at 405 (emphasis in original).

74. *Id.* at 405–06.

75. Apparently a Purcell City Ordinance provided for impounds from private property, but only where requested by the property owner. *Id.* at 405.

76. *Id.* at 406. Hence the Court suppressed scales found in an inventory search of the car, as well as ten plastic bags of viable marijuana seeds found pursuant to a search warrant issued, after a drug dog continued to hit on the car. *Id.* at 407.

77. On appeal the State argues, for the first time, that the search of McGaughey's car was lawful under a series of "abandoned property" cases. Yet none of these cases involve an illegal impound of the defendant's car, which is the key factor in McGaughey's challenge. *See Day v. State*, 1974 OK CR 19, 518 P.2d 1283; *Croney v. State*, 1971 OK CR 201, 485 P.2d 1062; *Henderson v. State*, 1985 OK CR 22, 695 P.2d 879.

removed. These same cases make clear that any evidence obtained through an inventory search following such a seizure would have been likewise unlawfully obtained and necessarily excluded. The question here, however, is whether the obtaining of a warrant to search McGaughey's car made the search of that car, though illegally seized, a lawful search. As the *Skelly* decision demonstrates, this is a close question. Under the facts and circumstances of this case, we conclude that *Skelly* is distinguishable and that the warranted search of McGaughey's car was legal.

¶ 48 *Skelly* is distinguishable upon a number of grounds. First, the illegal seizure in *Skelly* was followed by an illegal inventory search, which led to the discovery of evidence of drug dealing, *i.e.*, a set of scales. The police in McGaughey's case, however, did not take the opportunity of the seizure of his car to conduct an inventory search; hence they had no opportunity to gain evidence from such a search. Second, the illegal seizure in *Skelly* allowed the State an additional opportunity to have its drug dog sniff and "hit on" the Skelly car. In fact, the State argued in *Skelly* that the probable cause for the search warrant that was eventually obtained came from "the sniff by Scrapper while the car was impounded." [78] Hence it was reasonable for this Court to conclude that "the prior unreasonable seizure of the car taint[ed] the probable cause for the warrant subsequently developed by the police." [79] This conclusion should not be drawn in the current case.

¶ 49 In the current case all of the facts upon which the search warrant for McGaughey's car was based (*i.e.*, must have been based-we do not have the actual documents) were known and developed by the police prior to the illegal seizure. The officers did not conduct an inventory search; nor is there any allegation that they subjected McGaughey's car to a drug dog sniff or other test prior to obtaining the search warrant. Hence the State did not "profit" from the illegal seizure.[80]

78. 880 P.2d at 406.

79. *Id.*

80. McGaughey does not challenge the sufficiency of the affidavit for search warrant in his case; nor does he claim that the search warrant was

¶ 50 Although the decision to impound the car was wrong and constituted an illegal seizure, the subsequent warranted search of the car was not tainted by this illegality. In other words, although McGaughey may have been harmed by the illegal seizure, in the sense of losing possession of his car, the search of his car was *not* a harm flowing from the illegal seizure, since the police had probable cause to obtain a search warrant for the car, and (apparently) did so based upon evidence obtained prior to the illegal seizure. Thus the cocaine found in McGaughey's car was found via a lawful search warrant, and McGaughey's convictions for eluding police, possession of cocaine with intent to distribute, and failing to affix a drug tax stamp should be affirmed.

## Decision

¶ 51 The Judgments and Sentences of the District Court in Case No. CF–96–19 are **REVERSED.** The Judgments and Sentences of the District Court in Case No. CF–96–311 are **AFFIRMED.**

LUMPKIN, P.J. and LILE, J.: CONCUR IN PART/DISSENT IN PART.

JOHNSON, V.P.J. and STRUBHAR, J.: CONCUR.

LUMPKIN, Presiding Judge: Concur in Part/Dissent in Part.

¶ 1 I concur in the Court's decision to affirm the judgments and sentences in case No. CF–96–311. However, I am forced to dissent to the decision to reverse the judgments and sentences in Case No. CF–96–19.

¶ 2 The only error in this case has been committed at the appellate level by refashioning a legal issue for this Court to adjudicate which is not supported by the evidence in this record. That appellate error is set out on page twelve of the Court's opinion, wherein it states,

obtained through reliance upon evidence gained as a result of the car's seizure. McGaughey also does not challenge the authority of the police to have simply waited with his car until they obtained a warrant to search it.

the issue presented is whether an officer who stops a vehicle based upon a reasonable but mistaken belief that the vehicle or its driver has violated or is violating a traffic law (or other law) can continue the traffic stop after the officer realizes his mistake, where no other justification for continuing the stop has yet emerged.

First, the Court disregards all of the operative language of the provisions of 47 O.S. 1991, § 12–204, which provides in pertinent part as follows:

(a) Every motor vehicle, trailer, semitrailer and pole trailer, and any other vehicle which is being drawn at the end of a train of vehicles, **shall be equipped with at least one tail lamp mounted on the rear, which, when lighted as hereinbefore required, shall emit a red light plainly visible from a distance of five hundred (500) feet to the rear,** provided that in the case of a train of vehicles only the tail lamp on the rearmost vehicle need actually be seen from the distance specified. And further, every such above-mentioned vehicle, other than a truck tractor, registered in this state and manufactured or assembled after the effective date of this code, shall be equipped with at least two tail lamps mounted on the rear, on the same level and as widely spaced laterally as practicable, which, when lighted as herein required, shall comply with the provisions of this section. (emphasis added)

¶ 3 This statute has two specific requirements. First, the vehicle shall be equipped with tail lights and second, those tail lights shall emit a red light plainly visible from a distance of five hundred (500) feet to the rear. The Court wants to stop its reading of the statute with the requirement of having tail lights and disregard the requirement of being able to see the tail lights from a distance of five hundred feet. Granted, the evidence presented in this case was conflicting, however, it is up to the trier of fact to determine the weight and credit to be given to the testimony in adjudicating the issue presented. In this case, the trial judge did exactly that and there is evidence to support his decision. In this particular case, the basis for the stop was the belief that Appellant's vehicle had no tail lights. When the vehicle was stopped, the trooper saw the Tommy Lift on the back of Appellant's pickup. He also noted the fact that the Tommy Lift had louvers which covered the tail lights and blocked the amount of light that was actually coming from the tail lights. Under these facts, Appellant did have operational tail lights. However, they were not "plainly visible from a distance of five hundred (500) feet" as the louvers reduced the amount of light (thus making them visible only from close up). As a result, the initial stop was valid.

¶ 4 Further, the detention after the stop was valid. Contrary to the statement near the top of page 16 of the opinion, the officer's reasonable suspicion had not been dispelled. The tail lights were not visible from a distance of 500 feet. Therefore, under *Florida v. Royer*, the officer could legally request Appellant step from his vehicle and produce his drivers license. Also, shining the flashlight into the vehicle did not render the officer's observations illegal. *Gray v. State*, 561 P.2d 83, 87 (Okl.Cr.1977) citing *Elmore v. State*, 511 P.2d 595 (Okl.Cr.1973).

¶ 5 This case is distinguishable from *United States v. McSwain*, 29 F.3d 558 (10th Cir.1994), relied upon in the opinion. In *McSwain*, the trooper stopped the vehicle in order to determine the validity of the temporary registration sticker. The trooper observed that the temporary sticker was valid and had not expired. Yet the officer continued to detain and question the driver. The 10th Circuit Court of Appeals found that once the temporary sticker was found valid, the purpose of the stop was satisfied. In the present case, the tail lights, while operational, did not comply with the statutory requirement of visibility from a distance of 500 feet. Therefore, there was an ongoing traffic violation and the purpose of the stop had not been satisfied. I reach this conclusion based upon the officer's testimony. That testimony was disputed by the defense through a private investigator who attempted to recreate the scene. The investigator testified he traveled northbound at the scene, while Appellant traveled southbound, and attempted to view the tail lights using his rear view mirror.

Whether he was actually able to have the same observation as the officer is a question of fact. Additionally, he contacted a reconstructionist and former Oklahoma Highway Patrol trooper to obtain a formula for determining how many feet per second a vehicle travels. Using this data, he concluded: 1) the officer would have been beyond 500 feet of Appellant's vehicle by the time he looked in his rear view mirror to check the tail lights; and 2) the officer should have been able to see the tail lights as he came within 500 feet while approaching the pickup to effect the traffic stop.

¶ 6 The issue for our review is the validity of the trial court's ruling on a motion to suppress. The suppression of evidence is a judicial question and "we will not reverse the trial court upon a question of fact where there is a conflict of evidence, and there is competent evidence reasonably tending to support the judge's findings." *Battiest v. State*, 755 P.2d 688, 690 (Okl.Cr.1988). Officer Kimrey's testimony supported the trial court's denial of the motion to suppress. Therefore, I would find the motion was properly denied and there is no reason to reverse the convictions in Case No. CF–96–19.

¶ 7 As for the impoundment of the Corvette in Case No. CF–96–311, I would agree with the conclusion reached in the opinion that the impoundment was improper. Under *Skelly*, the impound was not legal as the car was on private property and the owner of the property had not requested the impoundment. I also agree with the opinion that the subsequent search of the car was not tainted by the improper impoundment, therefore the evidence seized as a result of that search was legally admitted.

¶ 8 This Court should not refashion issues before it into a preferred format in order to reach a desired result. In this case, the Court has made that mistake. The Court's mistake should not be attributed to the officer who, on the night in question, did not make a mistake in his stop under the plain language of the statute. While there may have been operational lights on the vehicle, those lights were obstructed and pursuant to the testimony which the trial judge deemed more credible, the obstruction prevented the officer from seeing the lights from within 500 feet. It should be noted, the officer was acting in a very professional manner and stated that he only intended to issue a warning citation. The fact he did not issue that warning, based upon the discovery of other criminal acts, does not taint the validity of this initial stop. Based on the evidence actually present in the record and an application of the statute as written, I would affirm the judgments and sentences in both cases.

LILE, Judge: Concurs in Part / Dissents in Part.

¶ 1 The Court today selectively ignores facts which appear in the record in order to reach its desired result. The officer was properly issuing a warning citation for obscured tail lights (a fact not disputed by any evidence in the case) when he observed the gun. His actions to that point and thereafter were entirely proper. Judge Winchester's evaluation of the factual situation at this non-jury trial was correct and his judgment should be affirmed. It is not the place of an appellate court to retry factual issues and it is not enough to say that with three votes or more the Court can do anything it wishes. There are limits to our authority which are however enforceable only by our own sense of duty and restraint.